## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KAREN A. PLEACHER, | CASE NO. 1:13-cv-02756- GBC |
| Plaintiff, | (MAGISTRATE JUDGE COHN) |
| v. | |
| | MEMORANDUM |
| CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | Docs. 1, 11, 12, 13, 16, 17 |

## <u>MEMORANDUM</u>

### I.     Procedural Background

On July 22, 2010, Plaintiff filed an application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). (Tr. 138-56). On September 7, 2010, the Bureau of Disability Determination denied these applications (Tr. 66-77), and Plaintiff filed a request for a hearing on October 19, 2010.  (Tr. 78-19). On November 7, 2011, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 28-65).  On March 22, 2012, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 11-27). On May 16, 2012, Plaintiff filed a request for review with the Appeals Council (Tr. 8-10), which the Appeals denied on September 13, 2013, thereby affirming the decision

of the ALJ as the "final decision" of the Commissioner. (Tr. 1-6).

On November 12, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On February 20, 2014, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 11, 12). On April 2, 2014, Plaintiff filed a brief in support of her appeal ("Pl. Brief"). (Doc. 13). On May 21, 2014, Defendant filed a brief in response ("Def. Brief"). (Doc. 16). On May 29, 2014, Plaintiff filed a brief in reply. ("Pl. Reply"). On November 19, 2014, the parties consented to transfer of this case to the undersigned for adjudication. (Doc. 19, 20).  The matter is now ripe for review.

## II.     Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In other words, substantial evidence requires

"more than a mere scintilla" but is "less than a preponderance." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

### III.   Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. *See* 20 C.F.R. § 404.1520.   The Commissioner must sequentially

determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC").   20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

## IV. Relevant Facts in the Record

Plaintiff was born on April 28, 1986 and was classified by the Regulations as a younger individual through the date of the ALJ decision. (Tr. 22). 20 C.F.R. §

404.1563. Plaintiff has at least a high school education and no past relevant work. (Tr. 22).

## A. Function Report and Testimony

On August 14, 2010, 2011, Plaintiff submitted a Function Report. (Tr. 192-200). She indicated that she cares for her husband and son, but her mother-in-law and her husband help when she is "having issues." (Tr. 193). She indicated that nightmares of childhood abuse interfere with her sleep. (Tr. 193). She indicated problems bathing, but no other problems with personal care. (Tr. 193). She reported that she cooks "mostly complete meals" on a "daily" basis for thirty minutes to an hour. (Tr. 194). She indicated that she does household chores for up to three hours once a week, and her mother-in-law takes her son while she is doing them. (Tr. 194). She reported that she goes outside "when needed," but does not "do too well with people" and cannot go out alone or drive due to anxiety. (Tr. 195). She indicated that she spends time with her neighbors and husband. (Tr. 196). She reported problems getting along with her family because she believes they are "responsible for what happened" to her and does not "trust anyone" except for her husband. (Tr. 197). She reported problems talking, hearing, memory, and getting along with others, but no physical problems. (Tr. 197). She indicated that she can walk for two and a half miles. (Tr. 197). She reported that she does not finish what she starts, follows written instructions "pretty well," but cannot follow

spoken instructions. (Tr. 197). She indicated that she had been "known to be belligerent with authority figures." (Tr. 198). She reported that she cannot handle stress or changes in routine and was "terrified of the dark." (Tr. 198). She indicated, "I don't have any [physical] pain." (Tr. 201).

On November 7, 2011, Plaintiff appeared and testified before the ALJ. (Tr. 36). She testified that she was able to drive, and drove to the hearing that day, but was unable to drive when she was not comfortable. (Tr. 36).  She testified that she had been unable to graduate from any of the four colleges she had attended due to problems getting along with authority figures and feeling threatened by other students. (Tr. 36-39). She testified that she had been unable to maintain employment due to a distrust of others "because of what happened to [her] when [she] was younger." (Tr. 39). She reported that she "can appear normal for a short amount of time, anywhere between three months to six months. But once people start to see through that and they start to see [her] and see what's wrong with [her]," she was afraid they would physically or emotionally retaliate against her. (Tr. 40). She indicated that she was afraid of the dark, "afraid of people that [she] can't see but [she] can hear and [she] know[s] that they're there and [she] know[s] they're going to hurt [her]." (Tr. 42). She explained that "anyone…within of 20 foot radius of" her may hurt her. (Tr. 42). She indicated that she had been in foster homes until 2004, but did not receive mental health treatment after her discharge

from Stony Ridge in 2001. (Tr. 29). She reported that she cannot work because she does not trust people, is scared all the time, has flashbacks all the time, and "black[s] out and lose[s] time." (Tr. 50). She testified that medications only help "to an extent" and cause side effects like jitteriness and sleepiness. (Tr. 54). She reported "forty-eight" suicide attempts in the past, most recently in "September of last year." (Tr. 56). She also testified that she could not be left alone because it would make her anxious. (Tr. 58). She admitted that she had "no" problems completing her homework, and spends "eight hours a day, probably approximately thirty to forty hours a week," on her schoolwork. (Tr. 62).

## B. Medical Records

Plaintiff was treated at Stone Bridge Transitional Care Home in 2001, when she was fifteen years old for about six weeks. (Tr. 243). She was discharged without suicidal ideation or prescription medications. (Tr. 244). Notes indicate that she would benefit from continued therapy, but there is no evidence of treatment in the record for nine years, from May 4, 2001 to June 21, 2010.  (Tr. 244).

On June 21, 2010, Plaintiff was evaluated by Dr. Muhammad Qamar, M.D, at Universal Community Behavioral Health Outpatient Clinic ("Universal"). (Tr. 252-53). She wanted to "get back on medications 'so [she] can go back to work.'" (Tr. 252). Plaintiff reported feeling depressed, irritable, and she does not enjoy anything. (Tr. 252). Plaintiff reported that she had been treating with a psychiatrist

after her admission in 2001, but that he left the area. (Tr. 252). She also reported that she had stopped taking her medications because she wanted to get pregnant, and was "not very comfortable with present situation of her moods." (Tr. 252). She indicated "a little bit of problems with sleep." (Tr. 252). She reported low energy and feelings of worthlessness, hopelessness, and helplessness. (Tr. 252). Her attention and concentration were "okay." (Tr. 252). She reported symptoms of mania one year earlier. (Tr. 252). She reported auditory hallucinations. (Tr. 252). Plaintiff denied being anxious but reported symptoms of PTSD from a history of abuse as a child. (Tr. 253). On examination, Plaintiff's mood was "mildly depressed," and her thought process was "illogical and disorganized." (Tr. 254). She had fair insight and judgment and her "capacity for activities of daily living" was "good." (Tr. 254). Dr. Qamar diagnosed Plaintiff with bipolar disorder, psychotic disorder, and borderline personality disorder. (Tr. 255). He assessed her to have a global assessment of functioning ("GAF") of 55. (Tr. 255). He prescribed Lamictal, Risperdal and Cogentin. (Tr. 255).

On July 26, 2010, Plaintiff reported to Dr. Qamar that she was dealing with a lot of stress, "feeling very frustrated," and "having some thoughts of harming self and others, but has no intent to act on these plans." (Tr. 250). On examination, Plaintiff's mood was "depressed and anxious." (Tr. 250). Plaintiff reported "some auditory hallucinations once in a while." (Tr. 250). Her insight and judgment were

fair and she was assessed a GAF of 55. (Tr. 250-51). Dr. Qamar prescribed lithium and increased her Risperdal. (Tr. 351). On August 10, 2010, notes indicate that Plaintiff was "under a lot of stress due to conflict in marriage" and that she had made no progressive toward her objectives. (Tr. 248).

On August 20, 2010, X-rays of Plaintiff's chest indicated "early infiltrate at her left lung base posteriorly." (Tr. 301).

On August 24, 2010, Plaintiff established care at Mount Union Medical Center. (Tr. 288-92). Plaintiff had been "diagnosed with bronchitis in the [emergency room] on 8/20, however…a chest X-ray here…shows for an early infiltrate left lung base posterior." (Tr. 292). Plaintiff had been given a five day prescription of Avelox and was "feeling much improvement, however, not completely." (Tr. 292). She still complained of shortness of breath and a cough. (Tr. 292). On examination, Plaintiff had "hoarse breath sounds throughout" and she was diagnosed with pneumonia. (Tr. 292). On August 31, 2010, Plaintiff followed-up and reported "doing a lot better now, some nasal congestion only." (Tr. 291). Plaintiff was started on Chantix to quit smoking cigarettes. (Tr. 291).

On September 3, 2010, state agency physician Dr. Edward Jones, PhD, reviewed Plaintiff's file and issued an opinion. He opined that Plaintiff would have moderate difficulties with detailed instructions, completing a normal routine with supervisions, getting along with coworkers, supervisors, and peers, and responding

appropriately to changes in the work setting. (Tr. 261-62). He explained that she was "maintained in outpatient mental health," was "independent in [activities of daily living], caring for her minor child, and "appear[ed] to be cognitively intact, overall." (Tr. 263). He noted that she had a "history of mania, but of late has been experiencing primarily some depressive symptoms. She has occasional [auditory hallucinations] historically, but ignores them." (Tr. 263). He found her to be only "partially credible" and concluded that she " can perform simple, routine, repetitive work in a stable environment….make simple decisions… is capable of asking simple questions and accepting instruction," although she had a low frustration tolerance. (Tr. 263). He also concluded that Plaintiff was "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairment." (Tr. 263). He opined that she had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. (Tr. 274).

On October 19, 2010, Plaintiff followed-up at Mount Union. (Tr. 290). Plaintiff requested a pill for weight loss, and then requested gastric bypass surgery. (Tr. 290). Plaintiff also complained of pain in her right leg when her child sat on her knee. (Tr. 290). Plaintiff was assessed to have morbid obesity and "unspecific complaint of right lower extremity discomfort." (Tr. 290). Plaintiff was instructed

to follow a 1200 calorie diet and was informed she "would have to be cleared" by a psychiatrist to get gastric bypass surgery. (Tr. 290).

On November 4, 2010, X-rays of Plaintiff's chest indicated "resolution of left lower lobe opacity with suggestion of right lower lobe opacity." (Tr. 300). As compared to the X-rays from August 20, 2010, Plaintiff's "lower left lobe opacity [had] resolved, there is now indication of a right lower lobe opacity." (Tr. 300).

On November 8, 2010, Plaintiff followed-up with Dr. Qamar. (Tr. 287). Plaintiff reported continued mood swings, breaking all of her dishes, and stopping lithium because she "could not think…could not talk…made her very lethargic…had slurred speech." (Tr. 287). Tr. 283). Plaintiff mental status examination was normal, with "fine" mood, "logical" thought process, and no hallucinations. (Tr. 287). Dr. Qamar prescribed Plaintiff's trileptal, increased her risperdal, and continued her cogentin. (Tr. 287).

On November 15, 2010, X-rays of Plaintiff's ankle indicated "avulsion from the tip of the fibula with associated soft tissue swelling and joint effusion." (Tr. 299).

On November 18, 2010, Plaintiff followed-up at Mount Union for obesity. (Tr. 288). She "claim[ed] she was watching her diet. However, when [she] discussed how many calories she is taking in she is not following a 1200 calorie diet." (Tr. 288). Plaintiff had recently broken her fibula and was having difficulty

exercise. (Tr. 288). Notes indicated that they would "continue to monitor" Plaintiff's obesity and investigate whether she could have gastric bypass surgery in Pittsburgh. (Tr. 288).

On December 6, 2010, Plaintiff followed-up with Dr. Qamar. (Tr. 286). Plaintiff reported that she was "stable on her medication" and "denie[d] any side effects of medication." (Tr. 286). Plaintiff mental status examination was normal, with "fine" mood, "logical" thought process, and no hallucinations. (Tr. 286). Dr. Qamar continued Plaintiff's medication. (Tr. 286).

On February 7, 2011, Plaintiff followed-up with Dr. Qamar. (Tr. 284). Plaintiff "sated that she is  pretty doing good and she is doing wonderful in school" but was having difficulty with "focus and concentration." (Tr.  284). Plaintiff mental status examination was normal, with "fine" mood, "logical" thought process, and no hallucinations. (Tr. 284). Dr. Qamar  prescribed Wellbutrin to address Plaintiff's focus and concentration. (Tr. 284).

 On April 11, 2011, Plaintiff followed-up with Dr. Qamar. (Tr. 283). Plaintiff "stated that she is doing good and she is doing wonderful in school" although there were "times when she has difficulty in focus and concentrating as she is going to DuBois College. (Tr. 283). Plaintiff mental status examination was normal, with "fine" mood, "logical" thought process, and no hallucinations. (Tr. 283). Dr. Qamar increased Plaintiff's Wellbutrin. (Tr. 283).

On June 6, 2011, Plaintiff followed-up with Dr. Qamar. (Tr. 281). Plaintiff reported that she was "doing the same" with "times when she gets depressed" and "times when she gets angry and irritable." (Tr.282). Her trileptal and Wellbutrin were increased. (Tr. 282). Plaintiff mental status examination was normal, with "fine" mood, "logical" thought process, and no hallucinations. (Tr. 282).

On July 15, 2011, Plaintiff followed-up at Universal. (Tr. 278). She had made progress toward her goals and her diagnoses were unchanged. (Tr. 278). She was "doing a good job keeping boundaries" with her mother, although she reported periods when she "lost time/blacked out." (Tr. 278).

On August 22, 2011, Plaintiff followed-up with Dr. Qamar. (Tr. 281). Dr. Qamar noted that Plaintiff was:

> [S]table on her medications. She has Some jitteriness and leg cramps and she feels that Risperdal might be causing this, I will reduce Rlsperdal to 1 mg b.Ld, because she did very well with that, Otherwise, Wellbutrin is helping her. She also has difficulty with focus and concentration. Her attention span is not good so I will increase Wellbutrin to Wellbutrin SR 150 mg q.a.m. and q. noon. Trileptal, I will continue the same and Cogentin the same.

(Tr. 281). Plaintiff mental status examination was normal, with "fine" mood, "logical" thought process, and no hallucinations. (Tr. 181).

On October 17, 2011, Plaintiff followed-up with Dr. Qamar. (Tr. 315). Plaintiff "had "left DuBois School and now is doing schooling online." (Tr. 315). Plaintiff reported that she "had to stop taking medications about a week ago

because she dislocated her hip, but when she was taking medication, she was doing wonderful; therefore she wants to continue back on her medications." (Tr. 315). Plaintiff mental status examination was normal, with "fine" mood, "logical" thought process, and no hallucinations. (Tr. 315). She was assessed to have a GAF of 55, she was "stable on her medications," and her medications were continued. (Tr. 315).

On November 9, 2011, Dr. Qamar issued a medical opinion. (Tr. 312). He opined that she had no more than mild limitations in all areas of work function except for "the ability to make judgments or complex work related decisions," in which she had a moderate limitation. (Tr. 310). Mild limitations were defined on the form as "a slight limitation in this area, but the individual can generally function well." (Tr. 310). Moderate limitations were defined as a "more than slight limitations in this area but the individual is still able to function satisfactorily." (Tr. 310). He opined that she was not markedly limited in any area. (Tr. 310).

### C. ALJ Findings

On March 22, 2012, the ALJ issued the decision. (Tr. 16). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 1, 1997, the alleged onset date. (Tr. 16). At step two, the ALJ found that Plaintiff's psychotic disorder, NOS; bipolar disorder; and borderline personality disorder were medically determinable and severe. (Tr. 16). At step three, the ALJ found that

Plaintiff did not meet or equal a Listing. (Tr. 17). The ALJ found that Plaintiff had

the RFC to:

> [P]erform a full range of work at all exertional levels but with the
> following nonexertional limitations: claimant is limited to simple,
> routine, repetitive, low stress work with no deadlines or fast-paced
> production; can have no interaction with the public; can have only
> occasional interaction with co-workers and supervisors; cannot
> perform teamwork jobs; and cannot have sustained interaction with
> co-workers and supervisors.

(Tr. 19).

A step four, the ALJ found that Plaintiff had no past relevant work. (Tr. 22).

At step five, in accordance with the VE testimony, the ALJ found that Plaintiff

could perform other work in the national economy. (Tr. 22). Consequently, the

ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 23).

## V.    Plaintiff Allegations of Error

## A. The ALJ's step two finding

Plaintiff asserts that the ALJ erred in not finding her obesity to be a severe

impairment at step two. (Pl. Brief at 16). Defendant responds that Plaintiff has

never alleged limitations arising out of her obesity, from her application to the time

of the hearing. (Def. Brief at 14).

The step two inquiry is a threshold test, and a failure to find an impairment

non-severe is generally harmless as long as the analysis progresses because non-

severe and severe impairments are considered at later steps. An error in finding an

impairment non-severe at step two will only be harmful if there are additional

functional limitations arising out of the impairment that were not considered at subsequent steps. In contrast, an improper finding that an impairment is not medically determinable is generally not harmless, because impairments that are not medically determinable may not be considered at later steps.   Here, the only additional limitation cited by Plaintiff is "sleep disturbances which could be exacerbated by her additional weight." (Pl. Brief at 18).

The ALJ considered the effects of Plaintiff's obesity at subsequent steps. At step three, the ALJ wrote that Plaintiff "has a history of obesity." (Tr. 17). However, the ALJ concluded that there was "no evidence of any significant complications and/or work-related limitations due to these conditions documented in the record" and there was no "indication of any substantial or ongoing treatment" for her obesity. (Tr. 17). In the RFC assessment, the ALJ specifically noted that Plaintiff "resulted that she experiences sleep disturbance as a result of her impairments." (Tr. 20). As discussed below, the ALJ properly considered Plaintiff's subjective complaints. Consequently, any error in failing to find that her obesity was severe at step two was harmless. As the Third Circuit has explained:

> We follow the Seventh Circuit and conclude that a remand is not required here because it would not affect the outcome of the case. Rutherford never mentioned obesity as a condition that contributed to her inability to work, even when asked directly by the ALJ to describe her impairments. So even if we assume—in accordance with common sense—that the administrative record's evidence of Rutherford's 5′2″ height and her weight of some 245 pounds sufficed to alert the ALJ that obesity could be a factor, Rutherford has not specified how that factor would affect the five-step analysis

undertaken by the ALJ, beyond an assertion that her weight makes it more difficult for her to stand, walk and manipulate her hands and fingers. That generalized response is not enough to require a remand, particularly when the administrative record indicates clearly that the ALJ relied on the voluminous medical evidence as a basis for his findings regarding her limitations and impairments. Because her doctors must also be viewed as aware of Rutherford's obvious obesity, we find that the ALJ's adoption of their conclusions constitutes a satisfactory if indirect consideration of that condition.

*Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005). The Court finds no merit to this allegation of error.

## B. Credibility Assessment

Plaintiff asserts that the ALJ failed to give an adequate rationale for rejecting her credibility. (Pl. Brief at 13). Here, the ALJ rejected Plaintiff's credibility because:

Despite claimant's allegations, her self-reported activities of daily living are inconsistent with an individual experiencing symptoms to the degree alleged. Although claimant reported and testified that she has limitations in her activities, the Administrative Law Judge notes that the claimant has previously reported that she is able to care for her personal needs independently; care for her son; watch movies; read; use the computer; and perform various household chores such as preparing meals, shopping, cleaning, and doing laundry (Exhibit 4E and Testimony). Claimant also reported that she uses Facebook on the computer regularly; talks to her neighbors; attends appointments regularly; and is able to drive (Exhibit 4E and Testimony). Claimant further testified that she spends several hours per day doing homework and other work related to her current enrollment in an online university (Testimony). It is also noted that treating sources have consistently reported that the claimant displayed appropriate grooming; normal speech; denied hallucinations or delusions; denied

suicidal or homicidal ideations; and was cooperative. (Exhibits 2F, 5F, 10F).

In terms of treatment, claimant reported that she takes the medications set forth in Exhibit 11E in the dosages indicated. The Administrative Law Judge notes that claimant has not reported experiencing side effects from her medications and there is no indication from any medical source of record that her medications have been frequently changed or the dosages altered due to side effects and/or ineffectiveness. The record reveals that claimant has been diagnosed with psychotic disorder, NOS; bipolar disorder; and borderline personality disorder (Exhibits IF, 2F, 5F, 10F). The record reveals that claimant has sought treatment for her mental impairments through Brook Lane Health Services when she was a teenager and through Universal Community Behavioral Health beginning in June 2010 (Exhibits IF, 2F, SF, 10F). The record reveals that claimant has treated for her mental impairments with medication and therapy (Exhibits 2F, 5F, 8F, 9F, 10F). It is specifically noted that a review of treatment notes from Universal Community Behavioral Health reveals that claimant has made progress in her treatment and that her moods have been repolted as fine (Exhibits 5F. 10F). Furthermore, despite claimant's allegations of auditory hallucinations, notes from Universal Community Behavioral Health indicate that these hallucinations occurred infrequently and the most recent notes reveal that claimant has consistently denied any such hallucinations (Exhibits 5F, 10F). Finally, it is noted that during the hearing, the claimant's attention and concentration were not so adversely affected by her alleged symptoms that she was unable to follow the proceedings or respond appropriately to questions.

(Tr. 20-21). The ALJ also relied on two medical opinions, one from Plaintiff's treating psychiatrist, which indicated that Plaintiff did not suffer marked limitations in any work-related function. (Tr. 21-22, 261-74, 310-12).

When making a credibility finding, "the adjudicator must consider whether

---

there is an underlying medically determinable physical or mental impairment(s)…that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7P. Then:

> [T]he adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7P; *see also* 20 C.F.R. § 416.929. "Under this evaluation, a variety of factors are considered, such as: (1) 'objective medical evidence,' (2) 'daily activities,' (3) 'location, duration, frequency and intensity,' (4) medication prescribed, including its effectiveness and side effects, (5) treatment, and (6) other measures to relieve pain." *Daniello v. Colvin*, CIV. 12-1023-GMS-MPT, 2013 WL 2405442 (D. Del. June 3, 2013) (citing 20 C.F.R. § 404.1529(c)). "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7p. In terms of treatment, SSR 96-7p provides that:

> Persistent attempts by the individual to obtain relief of pain or other symptoms, such as by increasing medications, trials of a variety of treatment modalities in an attempt to find one that works or that does not have side effects, referrals to specialists, or changing treatment sources may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms.

> On the other hand, the individual's statements may be less credible if the
> level or frequency of treatment is inconsistent with the level of complaints…

*Id.* Additionally, "the adjudicator may also consider his or her own recorded observations of the individual as part of the overall evaluation of the credibility of the individual's statements." *Id.*

Specifically, Plaintiff argues that that the ALJ erred in relying on her activities of daily living because he mischaracterized them. She further argues that sporadic and transitory activities of daily living may not be used to disprove disability. (Pl. Brief at 13).  Plaintiff also asserts that the ALJ's consideration of his observations of Plaintiff's social functioning during the hearing constitutes the impermissible "sit and squirm" method. (Pl. Brief at 14).

Defendant responds that Plaintiff's activities of daily living were not sporadic and transitory because:

> Plaintiff reported that she was able to care for her personal needs
> independently, care for her infant son, watch movies, read, perform
> various household chores (including preparing meals, shopping,
> cleaning, and doing laundry), drive, and take courses through an
> online university (Tr. 18, 37, 192-99). Indeed, Plaintiff reported
> spending approximately 30 to 40 hours per work on her coursework
> and testified that she had no problem completing her coursework
> because she was not around other people (Tr. 62).

(Def. Brief at 11).

Plaintiff described daily activities that were not sporadic or transitory. She admitted that she had "no" problems completing her homework, and spends "eight

hours a day, probably approximately thirty to forty hours a week," on her schoolwork. (Tr. 62). *See Horodenski v. Comm'r of Soc. Sec.,* 215 Fed.Appx. 183, 189 (3d Cir. 2007)*;White v. Astrue,* CIV.A. 10-1233, 2012 WL 1555399, at *8 (E.D. Pa. Jan. 24, 2012) *report and recommendation adopted,* CIV.A. 10-1233, 2012 WL 1555435 (E.D. Pa. May 3, 2012); *Napper v. Astrue,* 2:09-CV-00928, 2010 WL 2104149, at *8 (W.D. Pa. Apr. 28, 2010) *report and recommendation adopted,* 2:09CV928, 2010 WL 2104906 (W.D. Pa. May 25, 2010); *Conklin v. Comm'r of Soc. Sec.,* CIV.A. 09-1450-NLH, 2010 WL 2680278, at *6 (D.N.J. June 30, 2010).

Plaintiff also asserts that the ALJ erred in relying on his observations at the hearing and engaged in impermissible "sit and squirm" analysis. (Pl. Brief) (citing *Van Horn v. Schweiker,* 717 F.2d 871, 874 (3d Cir.1983)). However, the ALJ specifically empowered to consider observations of the Plaintiff from the hearing. SSR 96-7p. Moreover, when the credibility determination is not based only on the ALJ's observations, but also based on a review of the objective evidence, Courts generally hold that an ALJ has not engaged in "sit and squirm" analysis:

> Plaintiff argues that the ALJ erred by engaging in "sit and squirm" jurisprudence. (ECF No. 6, pp. 8–10). The "sit and squirm" method is employed when an ALJ expects a claimant to behave a certain way at the hearing and if the claimant fails to manifest the behaviors, the claim is denied. Van Horn v. Schweiker, 717 F.2d 871 (3d Cir.1983); Facyson v. Barnhart, 94 Fed.Appx. 110, *3 n. 7 (3d Cir.2004). Here, Plaintiff submits that the ALJ engaged in this method when she concluded that Plaintiff's "limited activities of daily living were more

a lifestyle choice than a frank disability" which the ALJ based on Plaintiff's interactions with his representative and others during the hearing. (ECF No. 6, pp. 8–10).After a review of the record, I disagree with Plaintiff that the ALJ engaged in "sit and squirm" jurisprudence. The ALJ considered Plaintiff's demeanor and testimony at the hearing, but only in conjunction with other evidence in the record in determining whether Plaintiff was disabled under the Act. (ECF No. 3–2, pp. 13–24). Thus, Plaintiff's demeanor was not the sine qua non of the ALJ's decision. Based on the same, I find that the ALJ did not engage in "sit and squirm" jurisprudence. Therefore, remand is not warranted on this basis.

*Pfingstler v. Colvin*, CIV.A. 13-84E, 2014 WL 811796, at \*3 (W.D. Pa. Mar. 3, 2014); *see also DeMarco v. Heckler*, 616 F.Supp. 644, 647 (E.D. Pa. 1985). Here, the ALJ considered his observations of Plaintiff in accordance with the Regulations in conjunction with a thorough review of the medical evidence. Thus, the ALJ did not engage in impermissible "sit and squirm" analysis.

Even if the ALJ erred in relying on his observations at the hearing or Plaintiff's activities of daily living, such error was harmless because substantial evidence supports the ALJ's decision even without the observations. The ALJ observed that Plaintiff received no treatment from 2001until June of 2010, and was only treated with medication and therapy thereafter. (Tr. 31). The ALJ also relied on two consistent opinions that Plaintiff's impairments did not preclude her from work. (Tr. 20-21). Plaintiff has not challenged the ALJ's reliance on these opinions. A reasonable mind could accept this evidence, in combination with Plaintiff's activities of daily living and demeanor at the hearing,  as adequate to

conclude that Plaintiff was not fully credible.

## C. The ALJ's Listing assessment

Plaintiff asserts that, because she was eleven at the time of her alleged onset, the child Listings should have been utilized. Plaintiff cites no legal authority for this proposition. (Pl. Brief at 9). Defendant responds that Plaintiff must establish disability between July 1, 2008 and September 30, 2010 to obtain DIB and between June 28, 2010 and March 22, 2012 to obtain SSI. (Def. Brief at 3) (citing 20 C.F.R. § 404.131(a); 20 C.F.R. §§ 416.335, 416.501, 416.330. Defendant notes that Plaintiff was twenty-two years old on July 1, 2008. (Def. Brief at 3).

Under the Act, an "adult" is someone who is eighteen years old or older, and a "child" is someone who has not yet obtained the age of eighteen. 20 C.F.R. § 416.902.The child Listing analysis only applies if the claimant meets the definition of "child" during the relevant period.  Plaintiff turned eighteen on April 28, 2004. The earliest relevant period begins on July 1, 2008. Plaintiff's delay in applying rendered her eligible only for adult benefits. Even if Plaintiff had applied prior to her eighteenth birthday, the proper standard would have been the adult Listings:

> Harrold applied for CDIB and SSI on June 10, 2005, the day before his eighteenth birthday. By the time of the hearing, however, Harrold had reached age nineteen. Harrold claims that the Child Listings should have been applied to him because his application date preceded his eighteenth birthday. We disagree.

> The regulations specifically state: the Commissioner will "never use the listings in part B to evaluate individuals who are age 18 or older." 20 C.F.R. §§ 404.1525(b)(2) and 416.925(b)(2). Because the regulations are phrased in the present tense—"are"—instead of in the past tense—"were"—we agree with the Commissioner that the Adult Listings of Part A were applicable in this case. Accordingly, we reject Harrold's threshold argument.

*Harrold v. Astrue*, 323 Fed.Appx. 114, 116 (3d Cir. 2009).   Even children who apply for and obtain SSI benefits are subject to a redetermination of disability based on adult standards after their eighteenth birthday. 20 C.F.R. § 416.987. Consequently, the proper standard to evaluate Plaintiff's eligibility on July 1, 2008 or later was the adult standard. There was no error in the ALJ's application of the adult Listings and, even if had been error, that error would be harmless. *Rutherford v. Barnhart*, 399 F.3d 546, 552-53 (3d Cir. 2005) (remand is not required when it would not affect the outcome of the case).

For the same reason, Plaintiff's argument that the ALJ should have considered her placement in a structured setting fails. (Pl. Brief at 10). Plaintiff was last placed in a structured setting on May of 2001, seven years prior to July 1, 2008. (Pl. Brief at 11). Thus, she would not have been eligible to meet that Listing during the relevant time. Her ability to work after this placement renders it minimally probative to Plaintiff's disability during the relative period. Thus, any error in failing to discuss Plaintiff's structured setting was harmless.

Plaintiff does not explicitly discuss the Adult Listings. However, she does note that Plaintiff had a "marked impairment in age-appropriate social

functioning." (Pl. Brief at 10). She argues that Plaintiff's "thoughts of harming others, borderline personality traits and mood wings are noted in her treatment records," and her history included abuse, homelessness, and placement in a foster home. (Pl. Brief at 10).

Plaintiff's argument could be construed as a challenge to the ALJ's finding that she had moderate limitations in maintaining social functioning. Her argument is insufficient, however, as it does not address the ALJ's rationale:

> The claimant reported that she does experience social withdrawal due to the symptoms associated with her impairments (Exhibit 4E and Testimony). Claimant has also reported that she has some difficulty interacting with others (Exhibit 4E and Testimony). However, the Administrative Law Judge notes that there is no evidence of evictions, firings, or domestic disputes due to maladaptive social behavior documented in the record. In addition, claimant has reported that she uses Facebook on the computer regularly; talks to her neighbors; and attends appointments regularly (Exhibit 4E and Testimony). It is noted that treating sources have reported that claimant displayed depression; mood swings; occasional auditory hallucinations; and social withdrawal (Exhibits 2F, SF, 10F). Despite this, it is also noted that a review of notes and reports from these sources reveals that claimant consistently displayed normal speech; denied hallucinations or delusions; denied suicidal or homicidal ideations; and was cooperative (Exhibits 2F, SF, 10F). Finally, it is noted that the claimant had no difficulty interacting with others in the hearing room and she engaged in no inappropriate social behavior throughout the course of the hearing.

(Tr. 18). A reasonable mind could accept the above as adequate to conclude that Plaintiff's limitations in social functioning were less-than-marked.

Similarly, Plaintiff asserts that she has "marked difficulties in maintaining concentration, persistence, or pace. (Pl. Brief at 10). Plaintiff cites her reports of suicidal thoughts and auditory hallucinations; the July 2010 observation that she had depressed mood, illogical and disorganized thought process, and diagnoses of bipolar disorder, psychotic disorder and borderline personality disorder; and Dr. Qamar's April 11, 2011 note that she had difficulty focusing. (Pl. Brief at 10) (citing Tr. 252-55281, 283). Her argument is insufficient, however, as it does not address the ALJ's rationale:

> The record reveals that claimant experiences problems completing tasks and maintaining concentration, persistence, or pace associated with her mental impairments (Exhibits 2F, SF, 10F). It is also noted that, while notes from treating sources reveal that claimant displays symptoms of depression; mood swings; irritability; and social withdrawal, these notes also reveal that claimant was consistently cooperative; displayed normal speech; denied any hallucinations or delusions; and denied any suicidal or homicidal ideations (Exhibits 2F, SF, 10F). Finally, it is noted that despite claimant's impairments, she was able to respond to all questions asked of her at the hearing in an appropriate manner with no overt lapses in concentration.

(Tr. 18). The Court further notes that Dr. Qamar increased her Wellbutrin in April of 2011 to address her difficulty with focus and concentration, and Plaintiff did not report problems with concentration after that date. (Tr. 281-83). Finally, neither Dr. Qamar nor the state agency opinion indicated that Plaintiff had more than moderate restrictions in concentration, persistence, and pace. *Supra.* A reasonable mind could accept the above as adequate to conclude that Plaintiff's limitations in

concentration, persistence, and pace were less-than-marked. The ALJ used the proper legal standard to assess whether Plaintiff met or equaled a Listing, and substantial evidence supports this assessment.

## VII.   Conclusion

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1382c; *Brown*, 845 F.2d at 1213; *Johnson*, 529 F.3d at 200; *Pierce*, 487 U.S. at 552; *Hartranft*, 181 F.3d at 360; *Plummer*, 186 F.3d at 427; *Jones*, 364 F.3d at 503. Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. *Monsour Med. Ctr.*, 806 F.2d at 1190. Here, a reasonable mind might accept the relevant evidence as adequate. Accordingly, the Court will affirm the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

An appropriate Order in accordance with this Memorandum will follow.

Dated: March 31, 2015                               *s/Gerald B. Cohn*
                                        _____
                                              GERALD B. COHN
                                        UNITED STATES MAGISTRATE JUDGE